[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court are two Motions for Summary Judgment to dismiss the claims of Hotel Associates, LLC (Plaintiff). One Motion, and Memorandum of Law in support thereof, was filed by HMS Associates Limited Partnership (HMS), Anthony M.B. Hart (Hart), and Fulford Manufacturing Company (Fulford) (hereinafter collectively referred to as the Fulford Defendants). Scottsdale Insurance Company (Scottsdale) filed the other Motion for Summary Judgment, and Memorandum of Law in support thereof, and two affidavits, one of Wm. Gerald McElroy, Jr., and one of Harold R. Moore. The Plaintiff filed Objections to both Motions. Both of the Defendants filed Replies in Opposition to the Plaintiff's Objections and the Plaintiff, in response, submitted Surreplies as to both Replies. Exhibits were attached to these filings. For the reasons set forth below, this Court grants the subject Motions for Summary Judgment.
 FACTS AND TRAVEL
The Property: the Fulford Defendants' Ownership
On or about February 14, 1985, Hart acquired a 100% ownership interest in Fulford, a Rhode Island manufacturer of precision materials operating out of a U-shaped, four-story brick building. Approximately one year after Hart's purchase of Fulford, HMS,[1] of which Hart was the general partner, purchased the Fulford building and the land upon which it sat, located at 107 Stewart Street in Providence, Rhode Island (Property). This Property is at the center of this civil action.
On or about August 9, 1986, a tornado hit and badly damaged the Fulford building. Thereafter, Hart paid in excess of $41,000 for a demolition company to perform work at the site after the tornado; however, the tornado did so much damage that the City of Providence ordered HMS to raze the building. HMS hired International Building Wrecking Company (IBWC) to perform this work.
At that time, Rhode Island regulations required that certain environmental work be performed prior to the issuance of a demolition permit. John Leo (Leo), a representative of the Rhode Island Department of Environmental Management (RIDEM), and two of his colleagues visited the Property on October 31, 1986. Leo identified hazardous waste and material that had to be removed before any demolition work could begin. Hart, on behalf of Fulford, hired Jet-Line Services, Inc., to remove the hazardous waste. He also hired International Asbestos to remove asbestos from the Property. At this time, Hart attempted to salvage anything of value from the Property, including selling the boiler that heated the building.
IBWC and Demolition of Fulford
In 1987, IBWC was a small family company engaged in the business of demolishing buildings. The principal owner of the company was Angelo Antignano, Jr. (Antignano), who owned 51% of the shares of the company. At the time of the demolition work, Antignano's son-in-law James Ney (Ney) owned 49% of the shares and was actively involved in the business. Both men toured the Property, which at that time, consisted of a single four-story U-shaped building, a separate boiler room, a chimney stack, and a courtyard outside of the building and boiler room.
In return for the payment of $50,000, IBWC agreed to "remove the building to approximately grade and break the foundation walls approximately one foot below grade." IBWC used the rubble from the demolition work to "in-fill the void left after demolition." The Fulford building had a five-foot below grade basement, most of which "was filled in" with brick and debris as IBWC performed its demolition work. There was a written contract for the demolition work performed by IBWC, which Hart signed on behalf of Fulford. However, IBWC's records for the project no longer exist, and no one involved in the case has been able to locate the contract. All of the demolition contracts which IBWC entered into included a provision stating that IBWC would not remove any hazardous waste.
In a letter to Ney dated February 4, 1987, Leo confirmed that the demolition work could begin. On February 6, 1987, a permit was approved allowing the demolition of the Fulford building. As of December 1987, with the demolition work completed, the Property consisted of an empty lot with no structures.
The Property: Sale to the Plaintiff
On December 2, 1987, HMS, by and through Hart as its general partner, entered into a Purchase and Sale Agreement (Sales Agreement) with Joseph Mollicone, Jr. (Mollicone), as trustee of Hotel Associates Realty Trust,[2] the predecessor to the Plaintiff, in which HMS agreed to sell to the Plaintiff and the Plaintiff agreed to buy the Property for the price of $400,000. The Plaintiff purchased the parcel for use as a parking lot.
The Sales Agreement was a standard form issued by Rhode Island Association of Realtors and contained no representations relating to the condition of the Property other than a provision describing the delivery of Property to the buyer and providing the buyer with a right to re-inspection. The Sales Agreement also provided that it constituted the "entire agreement between the parties" and that it was "subject to no understandings, conditions or representations other than those expressly stated therein."
On January 15, 1988, the parties closed on the Property. The Warranty Deed executed at the closing consisted of one page and made no representations as to the condition of the Property, including the underground storage tank (UST) issue in this case. At the closing, both parties were represented by counsel and had their respective brokers present.
At no time during the sale of the Property did Hart, on behalf of HMS, make any representations regarding the existence of the USTs on the Property. In fact, there were no communications at all between Hart and the Plaintiff regarding anything related to the environmental condition of the Property. The Plaintiff did not negotiate an indemnification provision that would have protected itself from future environmental liabilities.
The Property: Discovery of the Underground Storage Tanks
In 1995, the Plaintiff, as a condition of refinancing its business with its lender, conducted a subsurface environmental investigation. During the course of its investigation, three USTs, containing some 6,668 gallons of No. 6 fuel oil, were found buried on the Property. Also found were large amounts of soil and groundwater contamination by heating fuel oil. This discovery gave rise to these lawsuits. Lincoln Environmental Inc. (Lincoln) discovered the USTs at issue and the soil and groundwater contamination resulting from the leaking of fuel oil from the USTs. Lincoln did not, however, determine which of the fuel oil tanks was leaking or when the leaking first occurred. The USTs at issue were located outside the footprint of the former Fulford building, in what used to be a courtyard that housed the building and boiler room.
As owner of the Property, the Plaintiff, as required by law, closed and removed the USTs, disposed of the fuel oil therein and cleaned up the site, incurring expenses in connection therewith approximating $160,000.00.[3] On February 5, 1996, Joseph DiBattista (DiBattista) completed a "Rhode Island Division of Waste Management Permanent Closure Application For Underground Storage Tank(s)." See Def.'s Ex. 5. In March of 1996, an inspector from the Rhode Island Department of Environmental Management witnessed the permanent closure of the USTs and completed "Closure Inspection Sheets" to that effect. Id.
During the remediation, the Plaintiff was deprived of the use of the Property for a period of months, by which the Plaintiff lost income of some $15,000.00. Pursuant to a contract with the Plaintiff, Lincoln removed the USTs and cleaned up the pollution. The substances found in the USTs and the contaminated soil were determined to be No. 6 heating oil.
The Scottsdale Insurance Policy at Issue
Scottsdale insured IBWC pursuant to a comprehensive general liability policy which was effective from April 15, 1986, to April 15, 1987, subject to its terms, conditions and exclusions. Joseph Distel Company, Inc. (Distel), a wholesale insurance brokerage business located in Farmington, Connecticut, acted on behalf of Scottsdale in connection with the issuance of the Scottsdale policy (Policy). Distel Inc. has been unable to locate the Policy or any documents pertaining to its issuance as they were destroyed in the ordinary course of Distel's business. Counsel for Scottsdale has also been unable to obtain any documents from IBWC concerning the Policy. According to Antignano, any such documents were destroyed.
Travel
The Plaintiff filed two separate law suits in this matter regarding the discovery of three USTs containing No. 6 heating fuel oil located at the Property: Hotel Associates, LLC v. HMSAssociates Limited Partnership, Anthony M.B. Hart, FulfordManufacturing Co., and International Building Wrecking Co., C.A. No. 96-6273, and Hotel Associates, LLC v. Scottsdale InsuranceCo., C.A. No. 97-0507. On April 22, 1997, these actions were consolidated for purposes of trial. On July 3, 2003, the Plaintiff's Motion to Amend its Complaint against all the Defendants was granted (Amended Complaint). One of the Defendants named in the Amended Complaint is IBWC, which has been defunct since approximately 1992. Given this circumstance, the Plaintiff separately sued Scottsdale, the insurer of IBWC between 1986 and 1987.
In its Amended Complaint filed in C.A. No. 96-6273, the Plaintiff alleges the following three counts against Fulford Defendants: (1) a cause of action for equitable indemnification against HMS, as owner of the USTs, and Fulford, as operator of the USTs, based on their abandonment of the USTs in violation of RIDEM regulations, thereby disposing of the heating oil fuel in violation of G.L. § 23-19.1-22; (2) a private cause of action under G.L. § 23-19.1-22 for strict liability on behalf of the Plaintiff against Hart, HMS, and Fulford for their wrongful disposal of the heating fuel oil beneath the Property in violation of G.L. § 23-19.1-22; and (3) a cause of action for fraudulent nondisclosure against Hart and HMS for knowing of the USTs at and prior to the time of sale and actively concealing this material defect in having IBWC remove or cover all surface physical evidence of the USTs presence, and passively concealing the material defect in failing to disclose it to the Plaintiff.
In its Amended Complaint, filed in C.A. No. 97-0507, Plaintiff alleges the following three counts against Scottsdale: (1) a cause of action for equitable indemnification against IBWC for participating in the disposal of fuel oil in the USTs, by its removing and covering over of all surface evidence of the existence of the USTs, in violation of G.L. § 23-19.1-22; (2) a private cause of action under G.L. § 23-19.1-22 for strict liability to the Plaintiff against IBWC for its wrongful disposal of the heating fuel oil beneath the Property in violation of G.L. § 23-19.1-22; and (3) a cause of action for negligence for secreting the existence of the USTs.[4]
 STANDARD OF REVIEW
Summary judgment "is an extreme remedy . . . it must be applied cautiously." Golderese v. Suburban Land Co., 590 A.2d 395, 397 (R.I. 1991) (citing Trend Precious Metals Co. v. Sammartino,Inc., 577 A.2d 986, 988 (R.I. 1990); Mullins v. Federal DairyCo., 568 A.2d 759, 761 (R.I. 1990)). "Summary judgment is a proceeding in which the proponent must demonstrate by affidavits, depositions, pleadings and other documentary matter . . . that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact." Palmisciano v.Burrillville Racing Association, 603 A.2d 317, 320 (R.I. 1992) (citing Steinberg v. State, 427 A.2d 338 (R.I. 1981); Ludwigv. Kowal, 419 A.2d 297 (R.I. 1980)); see Super. R. Civ. P. Rule 56(c). During a summary judgment proceeding, "the court does not pass upon the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Id. (citingLennon v. MacGregor, 423 A.2d 820 (R.I. 1980)). Moreover, "the trial justice must look for factual issues, not determine them. . . . [t]he justice's only function is to determine whether there are any issues involving material facts." Steinberg v. State,
427 A.2d at 340 (citing Hodge v. Osteopathic General Hospital ofRhode Island, 107 R.I. 135, 142, 265 A.2d 733, 737 (1970);Industrial National Bank v. Peloso, 121 R.I. 305, 308,397 A.2d 1312, 1313 (1979)). "The purpose of summary judgment procedure is issue finding, not issue determination." Industrial NationalBank, 121 R.I. at 307, 397 A.2d at 1313 (1979) (citing O'Connorv. McKanna, 116 R.I. 627, 359 A.2d 350 (1976); Slefkin v.Tarkomian, 103 R.I. 495, 238 A.2d 742 (1968)). "Thus, the only task of a trial justice in ruling on a summary judgment motion is to determine whether there is a genuine issue concerning any material fact." Id. (citing Rhode Island Hospital TrustNational Bank v. Boiteau, 119 R.I. 64, 376 A.2d 323 (1977)).
"If an examination of the pleadings, affidavits, admissions, answers to interrogatories, and other similar matters, viewed in the light most favorable to the opposing party, reveals no such issue, then the suit is ripe for summary judgment." Rhode IslandHospital Trust National Bank, 119 R.I. at 66, 376 A.2d at 324-25 (citing Harold W. Merrill Post No. 16 Am. Legion v.Heirs-at-Law, Next of Kin and Devisee of Smith, 116 R.I. 646,630 A.2d 110 (1976); O'Connor v. McKanna, 116 R.I. 627,359 A.2d 350 (1976); Kurland Auto Leasing, Inc. v. I.S.K. ofMassachusetts, Inc., 111 R.I. 1730, 306 A.2d 839 (1973)). "[T]he opposing parties will not be allowed to rely upon mere allegations or denials in their pleadings. Rather, by affidavits or otherwise they have an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact."Bourg v. Bristol Boat Co., 705 A.2d 969 (R.I. 1998) (citingSt. Paul Fire Marine Insurance Co. v. Russo Brothers, Inc.,641 A.2d 1297, 1299 (R.I. 1994); Super. R. Civ. P. Rule 56(e)). However, it is not an absolute requirement that the nonmoving party file an affidavit in opposition to the motion. Steinbergv. State, 427 A.2d at 340. "If the affidavit of the moving party does not establish the absence of a material factual issue, the trial justice should deny the motion despite the failure of the nonmoving party to file a counteraffidavit." Id. (citingAdickes v. S.H. Kress Co., 398 U.S. 144, 159-60 (1970)).
 PRIVATE CAUSE OF ACTION UNDER THE HAZARDOUS WASTE MANAGEMENT ACT
The Hazardous Waste Management Act (HWMA) comprises Chapter 19.1 of Title 23 of the General Laws of Rhode Island See G.L. §§ 23-19.1-1 to 23-19.1-36. The parties raise two separate issues under the HWMA. However, this Court will address only whether a private cause of action exists under the HWMA as this issue is determinative. The issue is primary because if there is no private cause of action under the HWMA, the issue of whether the Defendants are liable for their alleged violations of the HWMA is irrelevant as the Plaintiff's cause of action is improper. Moreover, if there is no private cause of action, the Defendants are liable only to the State of Rhode Island if the State initiates proceedings against them. The Defendants argue no private cause of action exists under the HWMA, while the Plaintiff argues a private cause of action exists under the HWMA.
The Defendants' Argument
The Fulford Defendants and Scottsdale (hereinafter the Defendants) argue the enforcement proceedings provided in the HWMA are limited to State initiated proceedings in the Providence County Superior Court. The Defendants interpret the wording of G.L. § 23-19.1-15, providing for the initiation of proceedings under the HWMA to be in the Superior Court for Providence County, as reflective of the Rhode Island General Assembly's intention to empower only the designated executive agencies, which sit in Providence, with the enforcement authority of the HWMA. The Defendants argue that the Rhode Island legislature would not have limited the enforcement of the HWMA to just Providence County if it had intended to create a private cause of action under the statute. The Defendants also argue that, according to G.L. §23-19.1-22(c), only the Director of RIDEM or the Attorney General has the power to initiate such proceedings to enforce the HWMA.
The Defendants argue that a private right of action would conflict with the RIDEM Director's legislative mandate to exclusively control hazardous waste management in Rhode Island and with the duties charged to the Director under the HWMA. See
G.L. §§ 23-19.1-6, 23-19.1-10, 23-19.1-12, 23.19.1-18, and23-19.1-34. Under the HWMA, the Director is charged with determining what constitutes hazardous waste and with regulating its transportation, storage, and disposal through a permit process. The Defendants find the language of the HWMA overwhelming demonstrates that the legislature intended to vest exclusive control over the HWMA in the State of Rhode Island The Defendants disagree with the Plaintiff's argument that there are a number of damages available under the HWMA, and that the RIDEM and the Attorney General may pursue actions for environmental damage; thus, the other damages listed in the HWMA must be impliedly available to individuals through a private cause of action.
Furthermore, the Defendants note that when a statute "does not plainly provide for a private cause of action, such a right cannot be inferred." Bandoni v. State of Rhode Island,715 A.2d 580, 584 (R.I. 1998) (quoting In re John, 605 A.2d 486, 488 (R.I. 1992)). The Defendants also cite an unpublished Rhode Island Supreme Court order as a means of determining how the Supreme Court interprets standing under HWMA. In Stoutenburgh v.Dierauf, No. 90-194-Appeal (R.I. Dec. 13, 1990), the Rhode Island Supreme Court concluded as a matter of law that the "[HWMA] does not provide for a private right of action for violation of this act, but only for proceedings to be brought in the name of the Director of the Department of Environmental Management and/or the Attorney General on behalf of the state."Id. The Defendants find this unpublished order, wherein the Rhode Island Supreme Court for the first and only time addressed this issue, highly persuasive. Therefore, the Defendants believe, in light of the HWMA's plain language, which was affirmed by the Rhode Island Supreme Court in Stoutenburgh, they are entitled to judgment as a matter of law as the Plaintiff has no cause of action against them under the HWMA.
Lastly, the Defendants contend that in the case of CharterInternational Oil Co. v. United States, 925 F. Supp. 104 (D.R.I. 1996), the United States District Court for the District of Rhode Island did not determine a private cause of action exists under the HWMA. Rather, the Defendants argue that the federal court determined it could not decide whether the HWMA provided for a private cause of action and certified the question to the Rhode Island Supreme Court. The Defendants point out that this case settled before certification and thus, the Rhode Island Supreme Court was not given the opportunity to decide this issue.
The Plaintiff's Argument
The Plaintiff, relying upon arguments presented in CharterInternational Oil, finds a private cause of action exists under the HWMA, enabling it to sue the Defendants for alleged violations of the HWMA. The Plaintiff alleges the Fulford Defendants and IBWC, by violating G.L. § 23-19.1-22, are strictly liable to the Plaintiff for the costs of containment, removal, and cleanup of the disposed fuel oil, the restoration of the site, and the loss of use of the Property occasioned thereby. As to the Fulford Defendants, the Plaintiff argues their violation was willful and knowing. The Plaintiff prays that judgment enter jointly and severally against the Defendants for Plaintiff's damages, plus interest and cost. The Plaintiff also prays judgment enter jointly and severally against the Fulford Defendants for treble damages.
The Plaintiff finds the language of subsection (a) of G.L. §23-19.1-22 necessitates a finding that a private cause of action exists under the HWMA. Section 23-19.1-22 of the Rhode Island General Laws is entitled "Liability for unauthorized transportation, storage, or disposal." Subsection (a) lists the damages for which a violator of the HWMA is absolutely liable. These include the following: "the cost of containment, cleanup, restoration, and removal of the hazardous wastes, and for all damages, losses, or injuries, including environmental, which result directly or indirectly form the discharge." The Plaintiff acknowledges that permission is given to the Attorney General and the RIDEM Director to bring an action "with respect to environmental damage" under subsection (c); however, in the Plaintiff's view, given the list of damages in subsection (a), and that no one is specifically charged with enforcement of nonenvironmental damage under the HWMA, the HWMA begs the question as to who, other than the parties who have been made to bear such costs, may bring an action for the cost of containment, cleanup, restoration, and removal of the hazardous wastes. The Plaintiff argues the damages in subsection (a) imply a private right of action exists under the HWMA.
Analysis
The determination of whether the HWMA establishes a private cause of action is a matter of statutory interpretation. This issue is one of first impression in Rhode Island CharterInternational Oil, 925 F. Supp. at 111-117 (settling before the Rhode Island Supreme Court responded to the United States District Court for the District of Rhode Island's certification of this very issue). "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." Accent Store Design, Inc. v.Marathon House, Inc., 674 A.2d 1223, 1226 (R.I. 1996). The Court "presume[s] that the [l]egislature intended every word, sentence, or provision to serve some purpose and have some force and effect . . . [the Court] will not interpret a statute in a manner that would defeat the underlying purpose of enactment." Pier HouseInn, Inc. v. 421 Corp., Inc., 812 A.2d 799, 804 (R.I. 2002) (citing Dias v. Cinquegrana, 727 A.2d 198, 199-200 (R.I. 1999) (per curiam)). Therefore, when interpreting a legislative enactment, it is incumbent upon the Court to "determine and effectuate the [l]egislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes." Brennan v. Kirby, 529 A.2d 633, 637 (R.I. 1987).
Looking to the words of the HWMA, this Court finds the HWMA does not explicitly state whether a private cause of action does or does not exist under the HWMA. Previously, the legislature has expressed in statutory language when a private cause of action exists and does not exist. See, e.g., G.L. § 6-16-5.1(b)(3) (stating certain designated individuals "shall have a private cause of action at law and in equity against. . . ."); G.L. §27-29-1 (stating "[n]othing in this chapter shall be construed to create or imply a private cause of action for violation of this chapter.").
A rule of statutory interpretation "asserts that a statute, clear and unambiguous on its face, need not and cannot be interpreted by a court and that only statutes of doubtful meaning are subject to the process of statutory interpretation." Norman J. Singer, Statutes and Statutory Construction, § 45:02 at 6 (6th ed. 2000 Rev.); see, e.g., Podborski v. William H.Haskell Mfg., Co., 109 R.I. 1, 8-10, 279 A.2d 914, 918-19 (1971) (applying the language of P.L. 1969, ch. 146, because it was plain, explicit, and free from ambiguity). This Court does not find sufficient ambiguity on the face of the HWMA to warrant an interpretation of the text beyond its clear terms. As the Rhode Island Supreme Court stated in George A. Fuller Co. v. Schacke,71 R.I. 322, 326 (R.I. 1945), "[w]e conceive it our duty to give meaning to the words of the statute and to leave to the legislature further liberalization which is beyond the reasonable limits of judicial construction." "[W]hen the [l]egislature has spoken clearly, this Court will not infer a contrary result. `It is not the function of this Court to rewrite or to amend statutes enacted by the General Assembly.'" Pierce v. Pierce,770 A.2d 867, 872 (R.I. 2001) (quoting Rhode Island Federation ofTeachers, AFT, AFL-CIO v. Sundlun, 595 A.2d 799, 802 (R.I. 1991)). Moreover, "it is not for [a] court to legislate by judicial interpretation what [it] think[s] would be a more equitable result than that provided by the clear and unambiguous terms of the statute." Bloomfield v. Brown, 67 R.I. 452,25 A.2d 354 (1942).
The HWMA provides a clear and specific legal remedy for redressing violations of the HWMA. The HWMA describes in detail how the State may initiate a proceeding — in what court and by whom. Sections 23-19.1-15 and 23-19.1-22(b) of the Rhode Island General Laws expressly provide for the initiation of enforcement proceedings in the Providence County Superior Court:
 "G.L. § 23-19.1-15. Proceedings for enforcement. —
 The superior court for Providence county shall have jurisdiction to enforce the provisions of this chapter and any rule, regulation, or order issued pursuant to this chapter. Proceedings for enforcement may be instituted and prosecuted in the name of the director, and in any proceeding in which injunctive relief is sought, it shall not be necessary for the director to show that, without this relief, the injury which will result will be irreparable, or that the remedy at law is inadequate." (Emphasis added).
 "G.L. § 23-19.1-22. Liability for unauthorized transportation, storage, or disposal. —
 (b) Proceedings brought pursuant to this section shall be instituted by filing a complaint in the superior court." (Emphasis added).
This specification by the legislature importantly reflects the legislature's intent to empower the designated executive agencies, which sit in Providence, with enforcement authority of the HWMA. Such specificity reinforces the enforcement power granted by the legislature to the Director of RIDEM and the Attorney General under G.L. § 23-19.1-22(c). The General Assembly has provided detailed provisions in the HWMA on the enforcement of the HWMA by the State. Several provisions of the HWMA discuss the damages and penalties available for HWMA violations:
 "G.L. § 23-19.1-18. Criminal penalties — Payment of restoration costs. —
 (a) Unless otherwise specified, any person who shall refuse to obey or who shall knowingly violate, or reasonably should know that he or she is violating, the provisions of an order issued by the director
under the provisions of this chapter or any rules or regulations promulgated pursuant to this chapter, or who shall cause the refusal or violation, shall be guilty of a felony." (Emphasis added).
Accordingly, this Court finds it both unnecessary and inappropriate to seek or find a new, implied right of action under the HWMA. See G.L. § 23-19.1-22; see also Pontbriandv. Sundlun, 699 A.2d 856, 868 (R.I. 1997) (finding no implied private remedy for enforcement under G.L. § 19-14-2 when a specific remedy already existed for legal redress under the provisions of G.L. § 9-1-28.1); Citizens for Preservation ofWaterman Lake v. Davis, 420 A.2d 53 (R.I. 1980) (finding no implied private remedy for enforcement of wetlands act). This Court further notes that this position is consistent with the unpublished order of the Rhode Island Supreme Court. SeeStoutenburgh v. Dierauf, No. 90-194-Appeal (R.I. Dec. 13, 1990).[5]
In support of the Defendants' arguments, the regulatory and policy-based purposes behind the HWMA provide as follows:
 "(1) To protect the environment and the public health and safety from the effects of the improper, inadequate, or unsound management of hazardous wastes;
 (2) To establish a program of regulation over the storage, transportation, treatment, and disposal of hazardous wastes, without interrupting current regulation of industrial waste disposal;
 (3) To encourage the development and utilization of industrial processes which generate smaller amounts of hazardous wastes and to encourage recovery and recycling of wastes; and
 (4) To assure the safe and adequate management of hazardous wastes within Rhode Island" G.L. § 23-19.1-3.
The articulated purposes of the HWMA do not include the establishment of a private cause of action; rather, the purposes all refer to roles assigned by the legislature to the RIDEM to manage hazardous wastes. Furthermore, numerous sections of the HWMA stress the role of the RIDEM in making policy decisions regarding Rhode Island's natural resources and the role of the Director of the RIDEM in carrying out the purposes of the HWMA. Section 23-19.1-6 of the Rhode Island General Laws outlines some of the specific powers and duties of the director under the HWMA:
 "G.L. § 23-19.1-6. Powers and duties of the director. — (a) The director shall adopt any plans, rules, regulations, procedures, and standards as may be necessary to ensure proper, adequate, and sound hazardous waste management and to protect the health and safety of the public, and the environment from the effects of improper hazardous waste management. The plans, rules, regulations, procedures, and standards shall be developed by the director with input and review by the affected persons and agencies including the statewide planning program, the health department, and representative of the generator, transport, and disposal industry as well as an environmental representative. The rules, regulations, procedures, and standards as adopted by the director shall, to the maximum extent practical, be compatible with the rules, regulations, procedures, and standards promulgated by the U.S. environmental protection agency pursuant to §§ 3001-3006 of the Federal Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.
 (b) The director is authorized to exercise all powers, direct and incidental, necessary to carry out the purposes of this chapter, assure that the state complies with any federal hazardous waste management act and retains maximum control under it, and receives all desired federal grants, aid, and other benefits." (Emphasis added).
Other sections of the HWMA, referenced by the Defendants, provide the RIDEM Director with additional responsibilities. The following sections of the HWMA provide some examples:
 "G.L. § 23-19.1-10. Permits — Issuance — Renewal — Revocation — Exempted activities. —
 (a) After the rules and regulations required to be promulgated under this chapter take effect, no person shall construct, substantially alter, or operate any hazardous waste management facility, nor shall any person store, transport, treat, or dispose of any hazardous waste, except as exempted by this section, without first obtaining a permit from the director
for the facility or activity, nor shall any person accept or deliver hazardous waste from or to any person who does not possess a permit from the director for hazardous waste management, without the prior approval of the director, provided, that this section shall not be construed to require permits for the generation of hazardous waste." (Emphasis added).
 "G.L. § 23-19.1-12. Inspections — Penalty for hindering entry. —
 (a) For the purposes of enforcing this chapter or any rule or regulation issued pursuant to this chapter, the director may:
 (1) Enter any hazardous waste management facility or any place that the director has reason to believe hazardous wastes are generated, stored, treated, or disposed of;
 (2) Inspect vehicles which the director has reasonable ground to believe are being used for the transportation of hazardous wastes;
 (3) Inspect and obtain samples of any waste or other substance, labels, containers of waste or other substance, or samples from any vehicle in which hazardous wastes are transported or in which the director has reason to believe hazardous wastes are transported; and
 (4) Inspect and copy records, reports, information, or test results kept or maintained at a hazardous waste management facility.
 (b) Any person obstructing or hindering, or in any way causing to be obstructed or hindered, the director from the performance of his or her duties, or who shall refuse to permit the director entrance to any premises, building, vehicle, plant, or equipment, in the performance of the director's duties, shall be guilty of a misdemeanor and fined not more than five hundred dollars ($500)." (Emphasis added).
 "G.L. § 23-19.1-34. Hazardous waste haulers — Drivers license and certificate required. —
 No driver shall operate a vehicle hauling hazardous waste as defined in this chapter, unless the driver possesses a valid license of the appropriate class and a hazardous waste driver's certificate issued by the department of environmental management. Applicants for the certificate shall present evidence to the department of environmental management that they have successfully completed the hazardous waste material hauler driver training course developed by the department of environmental management and conducted by the employer, holder of the transporter's permit pursuant to § 23-19.1-10. The course shall specifically include training in transfer, handling, and spillage of hazardous waste materials, before a certificate may be issued. Certificates shall be issued only to applicants qualified by examinations prescribed and conducted by the employer or holders of the transporter's permits. The employer or holder of the transporter's permit shall certify to the director of the department of environmental management that the driver/applicant has successfully completed the course and test." (Emphasis added).
While liability under the HWMA may be strict, it is clear from the language of the HWMA, in its entirety, that the legislature left the HWMA's liability determination and enforcement in the hands of the RIDEM and the Attorney General. This Court finds the language and purpose of the HWMA convey that the legislature did not intend to create a private right of action.
Furthermore, this Court will not imply a private cause of action from a slight difference in terminology between two subsections of the HWMA. The Plaintiff aptly observes that G.L. §23-19.1-22(a) refers to several types damages. However, subsection (c), describing the proceedings which the State may initiate under the HWMA, refers to one type of damage. These subsections provide as follows:
 "G.L. § 23-19.1-22. Liability for unauthorized transportation, storage, or disposal
 (a) Any person who shall violate the provisions of this chapter through the transportation, storage, or disposal of hazardous wastes in a manner or location not authorized by this chapter or the rules and regulations promulgated pursuant to this chapter, or who shall have caused the unauthorized transportation, storage, or disposal of hazardous wastes shall be absolutely liable for the cost of containment, cleanup, restoration, and removal of the hazardous wastes, and for all damages, losses, or injuries, including environmental, which result directly or indirectly from the discharge.
 . . . .
 (c) The state, by and through the department of environmental management, is the trustee of the air, water, fish, and wildlife of the state. An action brought pursuant to the provisions of this chapter with respect to environmental damage may be brought by the attorney general or the director of the department of environmental management in the name of the state as trustee for those natural resources." (Emphasis added).
This Court finds the small variation in terminology on damages between the two subsections does not establish a brand new type of action under the HWMA. Moreover, subsection (c) specifically establishes a cause of action whereas subsection (a) makes no mention of any cause of action or proceeding whatsoever. These two subsections, given their plain and ordinary meaning, can be read in unison. Under subsection (c), the State may bring a cause action with regard to environmental damage. However, under subsection (a), the State must hold any person who violates the HWMA strictly liable. This plain reading of subsection (a) corresponds to the criminal penalties established by the HWMA.See, e.g., G.L. §§ 23-19.1-18(a), 23-19.1-12(b).
Finding the plain language of the HWMA does not provide for a private cause of action, this Court will not infer a contrary result. See Bandoni v. State of Rhode Island, 715 A.2d 580, 584 (R.I. 1998) (citing In re John, 605 A.2d 486, 488 (R.I. 1992) ("because the statute does not plainly provide for a private cause of action, such a right cannot be inferred")). This Court defers to the RIDEM and the legislature to determine whether the damages listed in subsection (a) permit recovery for private individuals and create a new private cause of action. This Court will not rewrite the HWMA. The HWMA in its entirety — the requirement that all actions be filed in Providence County Superior Court, the role of the State in the enforcement of the HWMA, and the purposes of the HWMA — clearly places the enforcement of its provisions in the State of Rhode Island A new, private cause of action under the HWMA could greatly hinder the achievement of the HWMA's purposes — particularly, the establishment of a program of regulation over hazardous waste without interrupting current regulation of industrial waste disposal, and the encouragement of the recovery and recycling of wastes. See G.L. § 23-19.1-3(2), (3). Finding the legislature did not establish a private cause of action under the HWMA and refusing to imply one, this Court grants the Defendants' Motions for Summary Judgment as to the Plaintiff's strict liability claims under the HWMA.
 EQUITABLE INDEMNIFICATION CLAIM
The Fulford Defendants and Scottsdale argue, for different reasons, that the Plaintiff has not met the three elements of equitable indemnification. The Plaintiff contends it should not, in equity, be made to bear liability for the wrongful acts of the Defendants without indemnification. The Plaintiff considers itself to be blameless with respect to the subject controversy.
Applicable Law
According to the law of equitable indemnification, the Plaintiff, as the prospective indemnitee, must establish the following three elements exist with regard to both the Fulford Defendants and Scottsdale:
 "1) the party seeking indemnity [Plaintiff] must be liable to a third party; 2) the prospective indemnitor [the Defendants] must also be liable to the third party; and 3) as between the prospective indemnitee [Plaintiff] and the indemnitor [the Defendants], the obligation ought to be discharged by the indemnitor [the Defendants]." RR Assocs. v. City of Providence Water Supply Bd., 724 A.2d 432, 434 (R.I. 1999).
The Plaintiff's equitable indemnification claims rely upon alleged violations by the Defendants of the RIDEM's Underground Storage Tank Regulations (UST Regulations) and the HWMA; however, the parties dispute which UST Regulations apply to the facts of this case. The Defendants maintain the Plaintiff has not met its burden with respect to its equitable indemnification claim.
The Fulford Defendants' Argument
The Fulford Defendants move this Court to grant summary judgment in their favor as to the Plaintiff's equitable indemnification claim on the grounds that it is improper. Essentially, the Fulford Defendants maintain that the Plaintiff did not satisfy the three elements of equitable indemnification. Specifically, the Fulford Defendants point out that, while the Plaintiff may have been obligated to a third party, the RIDEM, to remove the USTs and remediate the Property, the Fulford Defendants had no liability whatsoever to RIDEM. The Fulford Defendants argue the Plaintiff cannot prove such liability because the RIDEM did not ask or order the Fulford Defendants to remediate the Property and the RIDEM never cited the Fulford Defendants for violating UST Regulations prior to the sale.
Furthermore, the Fulford Defendants maintain they did not violate the UST Regulations in effect at the time the Property was sold on January 15, 1988:
 "SECTION 5. APPLICABILITY
 (a) These regulations apply to new, existing and abandoned facilities at which petroleum product(s) and/or hazardous material(s) serving institutions or industrial, commercial, educational, agricultural or governmental operations are stored underground.
 (b) Except for Section 14, Leak and Spill Response, these regulations do not apply to: . . .
 (4) Underground storage tanks used for storing No. 4, No. 5, or No. 6 fuel oil." Department of Environmental Management, Rules and Regulations For Underground Storage Facilities Used For Petroleum Products and Hazardous Materials (filed April 18, 1985). (emphasis as provided by the Fulford Defendants).
Aware of the fact that these regulations have been reissued a number of times, the Fulford Defendants argue the UST Regulations applicable to this case are those that were promulgated in 1985. This set of regulations required closure and prohibited abandonment of USTs that were no longer in use. However, these regulations also expressly stated that these closure regulations did not apply to USTs storing No. 6 fuel oil. See Section 5, 1985 UST Regulations. Therefore, assuming they even knew about the USTs, the Fulford Defendants claim they had no legal obligation to close the USTs because the substance found in the USTs was No. 6 heating oil; thus, these regulations did not apply. As a result, the Defendants claim they could not have violated that which did not apply to them.
The Fulford Defendants further note that the pertinent 1985 UST Regulations applied to all owners and operators of USTs, as of 1992, who had owned or operated USTs since May of 1985. The Fulford Defendants therefore maintain that they do not fall within the applicable category of persons to which the 1992 Amendments to the UST Regulations apply because they did not have any interest in the USTs on the Property in 1992; thus, they contend the Plaintiff has not met its burden of proof. Furthermore, the Fulford Defendants argue that the only party who was subject to the 1992 Amendments was the Plaintiff, the owner of the USTs in 1992.
Scottsdale's Argument
Scottsdale argues no acts on the part of IBWC caused liability to be imposed upon the Plaintiff. Scottsdale asserts that the Plaintiff does not meet two of the three elements of equitable indemnification. According to Scottsdale, the only element met is that the Plaintiff is liable to a third party (RIDEM). With regard to the remaining elements, Scottsdale argues that IBWC is not liable to RIDEM, and that there is no basis for an argument that the costs to remediate should be born by IBWC as opposed to the Plaintiff. Scottsdale argues IBWC did not commit a wrongful act against the Plaintiff. To Scottsdale, IBWC completed the demolition work which it was contractually obligated to perform and had no responsibilities with respect to the USTs. Accordingly, Scottsdale contends the Plaintiff, as the purchaser of the Property, should have conducted a due diligence investigation to determine if there were environmental problems at the site.
The Plaintiff's Argument
The Plaintiff premises its equitable indemnification claim on different theories for each defendant. With regard to the Fulford Defendants, the Plaintiff contends the elements of equitable indemnification are met because they abandoned the USTs in violation of RIDEM's UST Regulations, thereby disposing of the heating fuel oil in violation of the HWMA. The Plaintiff references two different versions of the UST Regulations in support of this argument, seeming to make two distinct arguments based upon them.
In its Objection to the Defendants' Motion for Summary Judgment (filed September 8, 2003), the Plaintiff claims the Fulford Defendants violated the 1992 Amendments to the UST Regulations by abandoning the USTs on the Property. The Plaintiff argues these regulations retroactively apply to the Fulford Defendants pursuant to section 5.01:
 "SECTION 5.00 APPLICABILITY
 5.01 General Applicability: Unless otherwise noted, these regulations apply to all proposed, new and existing underground storage tank facilities, at which petroleum product(s) and/or hazardous material(s) are or have been stored underground in tank or tank systems; whether such facilities serve institutional, industrial, commercial educational, agricultural, governmental, residential or other purposes; and whether such facilities or USTs located there upon, have been abandoned; and to persons who owned or operated such facilities since May, 1985." (Emphasis added).
The Plaintiff interprets this to have "retroactive application to all persons who owned or operated USTs after May of 1986 [sic], including owners and operators of No. 6 fuel oil tanks, as were HMS and Fulford." Plaintiff's Objection to the Defendants' Motion for Summary Judgment at 4. Therefore, the Plaintiff interprets "since 1985" in the 1992 Amendments to mean "after 1985."
Accordingly, to the Plaintiff, the 1992 Amendments retroactively applied to the Fulford Defendants since these regulations applied to all persons who owned or operated USTs after May 1985, including operators and owners of No. 6 fuel oil tanks. As these regulations prohibit the abandonment of any UST, the Plaintiff argues the Fulford Defendants violated the 1992 Amendments when they abandoned the USTs on the Property, as evidenced by the following: the lack of intention of the Fulford Defendants to further use the USTs after the demolition of the Fulford building, Hart's testimony that he did not intend to rebuild on the Property, the hiring of IBWC to demolish the Fulford building, Fulford's and HMS's leaving the fuel tanks and oil in place beneath the Property, Fulford's and HMS's removing and covering all surface evidence of their existence, and HMS's sale of the Property to the Plaintiff as a "vacant" land without disclosure. Finding the Fulford Defendants abandoned the USTs in violation of sections 15.01 and 15.02 of the 1992 Amendments, which follow, the Plaintiff asserts the Fulford Defendants are liable for the USTs and should indemnify the Plaintiff for the costs of removing them:
 "SECTION 15.00 CLOSURE
 15.01 Applicability: This Section shall apply to all facilities where petroleum product(s) and/or hazardous materials are or were stored as defined in Section 5.00.
 15.02 Prohibitions: (A) The abandonment of any UST or UST system is prohibited." Department of Environmental Management, Rules and Regulations For Underground Storage Facilities Used For Petroleum Products and Hazardous Materials (filed Dec. 10, 1993) (emphasis added) (1992 Amendments).
In its Surreply, the Plaintiff relies upon the following section of the UST Regulations, also entitled "General Applicability:"
 "3.00 RULE 3 APPLICABILITY
 The terms and provisions of these rules and regulations shall be liberally construed to permit the Department to effectuate the purposes of state law, goals, and policies.
 3.01 General Applicability: Unless otherwise noted, these regulations apply to all proposed, new and existing underground storage tank facilities, at which petroleum product(s) and/or hazardous material(s) are or have been stored underground in a tank or tank system; whether such facilities serve institutional, industrial, commercial, educational, agricultural, governmental, residential or other purposes; and whether such facilities or UST located there upon, have been abandoned; and to persons who owned or operated such facilities after May, 1985." (Emphasis added).[6]
The Plaintiff argues section 3.01 applies to the Fulford Defendants because the language of the regulation is in the past tense. The Plaintiff contends this section imposes no requirement that owners or operators of USTs after May, 1985 maintain ownership or operation as of 1992 for the regulations to apply. To the Plaintiff, the Fulford Defendants' liability arises from the Plaintiff having to close the USTs, to remove and properly dispose of the fuel oil, and to clean up the site when such actions derived solely from Plaintiff's taking ownership of the Property from HMS. The Plaintiff also maintains that one obvious purpose of amending the regulations was to allow enforcement of the regulations against prior owners and operators of USTs, which includes the Fulford Defendants.
With regard to its equitable indemnification claim against Scottsdale, the Plaintiff pleads its claim more generally. In its Amended Complaint, the Plaintiff claims Scottsdale is liable for participating in the disposal of fuel oil in violation of the HWMA. The Plaintiff alleges IBWC, by its removing and covering over of all surface evidence of the USTs, participated in the disposal of the fuel oil contained therein in violation of G.L. §23-19.1-22. Therefore, the Plaintiff finds IBWC liable for the cost to cleanup the USTs. The Plaintiff asserts its claim is based on IBWC's participation in the disposal of the fuel oil contained in the USTs in violation of the HWMA. The Plaintiff, pointing out that the HWMA is applicable to "any person," concludes the fact that IBWC was neither the owner nor operator of the abandoned fuel tanks is simply of no merit.
Analysis
After reviewing the 2002 UST Regulations in their entirety, this Court finds none of the UST Regulations cited by the parties applies to the facts of this case. Specifically, neither the 1985 UST Regulations, cited by the Fulford Defendants, nor the 1992 Amendments, cited by the Plaintiff, apply. This Court also finds the 2002 UST Regulations inapplicable.
Section 22 of the 2002 UST Regulations, entitled "Superseded Rules and Regulations," specifically limits the application of the 2002 UST Regulations as follows:
 "On the effective date of these Rules and Regulations [October 22, 2002], all previous Rules and Regulations, and any policies regarding the administration and enforcement of the Regulations for Underground Storage Facilities Used for Petroleum Products and Hazardous Materials, adopted in 1985 and as amended in 1987, 1989, 1992, 1993, and 2002 shall be superseded. However, any enforcement action taken by, or application submitted to, the Department prior to the effective date of these Rules and Regulations shall be governed by the Rules and Regulations in effect at the time the enforcement action was taken, or application filed." Department of Environmental Management, Rules and Regulations For Underground Storage Facilities Used For Petroleum Products and Hazardous Materials (effective October 22, 2002) (emphasis added).
Applying section 22 to the case at bar, this Court finds the 2002 UST Regulations will not supersede all earlier UST Regulations and apply to this case. According to this section, an earlier UST Regulation may be applied but only if one of two other scenariosis applicable: (1) the RIDEM took an enforcement action with regard to the USTs at issue prior to October 22, 2002 or (2) a UST closure application was submitted to RIDEM for the USTs at issue prior to October 22, 2002. If either of theses scenarios applies, the 2002 UST Regulations dictate that the applicable UST Regulations are those in effect at the time of the enforcement or at the time of the application. In other words, if there was no application for closure or enforcement action taken in this case prior to October 22, 2002, the 2002 UST Regulations would apply. Here, the RIDEM did not take any enforcement actions under the UST Regulations with regard to the USTs at issue; however, an application to close the USTs at issue was made prior to the effective date of these regulations.
The record reveals that on February 5, 1996, DiBattista completed a "Rhode Island Division of Waste Management Permanent Closure Application For Underground Storage Tank(s)." The record also reveals that in March of 1996, an inspector from the Rhode Island Department of Environmental Management witnessed the permanent closure of the USTs and completed "Closure Inspection Sheets" to that effect. See Exhibit 5, Fulford Defendants' Motion for Summary Judgment. Therefore, this Court finds the 2002 UST Regulations, the 1985 UST Regulations, and the 1992 Amendments all inapplicable to the facts of this case. Rather, the USTs Regulations applicable to this case are those that were in effect at the time of the closure of the USTs.
Prior to October 22, 2002, the effective date of the 2002 UST Regulations, an application was filed to close the USTs at the Property. However, the UST Regulations applicable to this time period are not before this Court. It appears the parties in this case focused upon those UST Regulations applicable to the time period when the Fulford Defendants had ownership of the Property in 1985; however, in doing so, the parties failed to follow the development of the UST Regulations, which have been amended at numerous times, since then. As the Plaintiff did not apply the appropriate UST Regulations to the facts of this case, this Court finds the Plaintiff's claim for equitable indemnification fails.
Irrespective of its reliance on the UST Regulations, this Court finds the Plaintiff's equitable indemnification claims unfounded on other grounds. The Plaintiff rests its equitable indemnification claims upon nonexistent violations by the Defendants of the UST Regulations and the HWMA. However, the Plaintiff lacks the legal authority to determine such violations. The RIDEM and its Director have authority over the UST Regulations. The RIDEM, through its regulatory authority, furthers the purposes of the UST Regulations; purposes which do not include a private right of individuals to assess violations of UST Regulations. The UST Regulations provide as follows:
 "The purposes of these rules and regulations are to:
 (A) Protect the waters of the state, including groundwater, from pollution resulting from the underground storage of petroleum products and hazardous materials;
 (B) Establish procedures and requirements for the assessment and remediation of sites contaminated due to releases associated with the underground storage of petroleum products or hazardous materials;
 (C) Implement a system of registration of underground storage tank facilities;
 (D) Prevent releases from underground storage tanks of petroleum products or hazardous materials by establishing siting, design, installation and operating requirements for underground storage tank (UST) systems;
 (E) Establish facility leak detection and monitoring requirements, and schedules, for the early detection of releases from underground storage tanks;
 (F) Require facility owners/operators to guarantee the availability of sufficient resources to respond to and rectify releases from underground storage tanks systems;
 (G) Establish fees and a schedule of payment for such fees; and
 (H) Establish UST closure procedures that provide for protection of human health and the environment." 2002 UST Regulations section 1.00.
The UST Regulations give the RIDEM Director various responsibilities and duties to fulfill these purposes, including the issuance of certificates of registration to facilities, ordering the closure of facilities, and approval of new or replacement UST systems. See Rule 6.03 ("[t]he owner/operator of an UST facility shall apply for and obtain a certificate of registration from the Director in accordance with the following schedule"), 6.5(B) ("[w]here an owner/operator of a Facility who fails to obtain a certificate of registration from the Department, the Director may order the owner/operator to immediately implement temporary or permanent closure procedures in accordance with Rule 13 Closure, of these regulations."), Rule 9.3(B) ("[l]etters of approval from the Director authorizing the installation of new/replacement UST systems or modification of an existing UST system are valid for a period of one (1) year from the date of issuance. Approvals may be extended by the Director upon written request by the owner/operator."). Most importantly, according to Rule 20 of the 2002 UST Regulations, the RIDEM Director is given exclusive authority to assess violations of the UST Regulations, which provide as follows:
 "20.00 RULE 20 PENALTIES
 The Director shall assess all penalties for violation of these regulations in accordance with the provisions of Rhode Island General Laws Chapters 46-12, 42-17.1, 42-17.6 and 23-19.1 and the `Rules and Regulations for Assessment of Administrative Penalties'."
Therefore, only the executive branch of the State of Rhode Island can establish violations of the UST Regulations or the HWMA. The Plaintiff cannot stand in the shoes of the State and allege violations of the HWMA or the UST Regulations and use such allegations to support claims for equitable indemnification when the State did not find the Defendants in violation of the HWMA or UST Regulations. Only the RIDEM Director may assess penalties under the UST Regulations and, to date, the RIDEM Director has not alleged UST Regulation violations against the Defendants with regard to the Property. As aforementioned, the Plaintiff also cannot enforce the HWMA as the enforcement authority of the HWMA belongs to the RIDEM Director and the Attorney General, and, to date, neither has alleged violations against the Defendants.
Acknowledging that the RIDEM is not an agent of the Fulford Defendants, this Court also recognizes that the Plaintiff is not an agent of the RIDEM with regard to the UST Regulations or to the HWMA. The UST Regulations, like the HWMA, place the determination of liability and the authority of enforcement of their provisions in the hands of the State of Rhode Island Thus, the Defendants are not in violation of the UST Regulations or the HWMA. Therefore, the Plaintiff has not met the elements for equitable indemnification as to either defendant, and no genuine issue of material fact exists. Accordingly, this Court grants the Fulford Defendants' and Scottsdale's Motion for Summary Judgment as to the Plaintiff's claim for equitable indemnification.
 FRAUDULENT NONDISCLOSURE CLAIM
The issue presented here by the parties is whether Rhode Island law allows for an exception, in instances of passive concealment of a material defect, to the doctrine of caveat emptor in commercial real estate transactions. The Fulford Defendants' argue no exceptions to the doctrine of caveat emptor apply to this case and that the doctrine bars the Plaintiff's claims. In contrast, the Plaintiff argues this exception applies in Rhode Island and that it provides the basis of their fraudulent nondisclosure claim.
Under the doctrine of caveat emptor, a seller of commercial real estate does not have an affirmative duty to disclose conditions or defects associated with the property for sale to the commercial buyer. Wilson Auto Enterprises, Inc. v. Mobil OilCorp., 778 F. Supp. 101, 104-105 (D.R.I. 1991). Rather, this doctrine places the burden on the purchaser to seek information about the property. Id. at 105. The purchaser of commercial real estate must protect itself and guard against future liabilities through contract. A sophisticated buyer has the option to inspect the property and to inquire into possible defects. Hydro-Manufacturing, Inc. v. Kayser-Roth Corp.,640 A.2d 950, 956 (R.I. 1994). A buyer "concerned about possible future liability resulting from a prior owner's actions can seek a reduction in the sale price, seek indemnity from the seller (through a warranty), or walk away from the sale." Id. at 955-56.
The Fulford Defendants' Argument
The Fulford Defendants argue that they owed the Plaintiff no duty to disclose the presence of USTs on the Property at the time of the sale because the doctrine of caveat emptor applies to commercial real estate transactions in Rhode Island, and because this doctrine applies to the commercial transaction at issue in this case. Specifically, to the Fulford Defendants, the relationship between a seller and purchaser in a commercial real estate transaction in Rhode Island is controlled by the doctrine of caveat emptor, the few exceptions of which the Fulford Defendants do not find present in this case. See, e.g.,Wilson Auto Enterprises, Inc. v. Mobil Oil Corp., 778 F. Supp. 101, 104-105 (D.R.I. 1991).
The Fulford Defendants acknowledge there are exceptions to the doctrine of caveat emptor; however, they contend only one exception has been applied to a commercial transaction in Rhode Island This exception regards fraudulent misrepresentation and applies when a seller does not answer truthfully a buyer's inquiry as to the property and the buyer subsequently relies upon the seller's misrepresentation to its detriment. Cheetham v.Ferreira, 56 A.2d 861, 863 (R.I. 1948). In dicta in Hydro, the Fulford Defendants point out that the Rhode Island Supreme Court recognized that other jurisdictions have developed an exception to caveat emptor based on a failure to disclose dangerous conditions. The Fulford Defendants note that the Rhode Island Supreme Court clearly did not adopt this exception by this assertion. Hydro, 640 A.2d at 956. Moreover, even if the Rhode Island Supreme Court did accept it, the Fulford Defendants note that the cases cited by the Rhode Island Supreme Court for the exception were applied exclusively in the residential context and, therefore, have no applicability to this action involving a commercial transaction. Furthermore, the Fulford Defendants maintain that the additional exceptions to caveat emptor that have been established in Rhode Island have been applied only to the realm of residential real estate transactions in Rhode Island See, e.g., Stebbins v. Wells, 766 A.2d 369 (R.I. 2001) (determining that a natural water erosion condition on a residential property may constitute a discloseable, deficient defect under the Rhode Island Real Estate Disclosure statute, R.I. Gen. Laws § 5-20.8). The Fulford Defendants point out that the Rhode Island Supreme Court has been unwilling to extend these residential exceptions into the commercial setting. See BostonInvestment Property #1 State v. E.W. Burman, Inc., 658 A.2d 515, 517-18 (R.I. 1995).
Moreover, the Fulford Defendants argue the doctrine of caveat emptor applies to the transaction at issue because it involves the sale of commercial real estate between two business entities. The Fulford Defendants contend the Plaintiff was well aware of the use of the Property prior to 1988 and that the Plaintiff's lack of due diligence was not the result of commercial ignorance or unequal bargaining power. In the Fulford Defendants' view, the Plaintiff was and is a sophisticated commercial entity engaged in the acquisition, ownership, management, and development of Rhode Island real estate. The Fulford Defendants also point out that one of the principals of the Plaintiff was an experienced real estate lawyer and that he and other principals were also principals in other companies dedicated to real estate ownership at the time of the sale. In addition, the Fulford Defendants note that the Plaintiff was represented by counsel and a real estate broker during the sale of the Property.
The Fulford Defendants further contend that the Plaintiff's president and former trustee, DiBattista, had worked across the street from the Fulford facility for over 20 years and, thus, should have been familiar with the operations on the Property. The Fulford Defendants also point out that the Plaintiff neither discussed with Hart whether the Property contained any USTs nor presented any other potential environmental liabilities. The Fulford Defendants stress that the Plaintiff did not conduct an environmental investigation of the Property prior to its transfer or negotiate an indemnification provision protecting it from future liabilities, environmental or otherwise. The Fulford Defendants believe the Plaintiff had the tools to protect itself from future environmental liability, and its failure to do the most basic due diligence was to its own detriment.
The Fulford Defendants chiefly rely upon two Rhode Island Supreme Court cases and one federal case to support the application of caveat emptor in this case. InHydro-Manufacturing, Inc. v. Kayser-Roth Corp., 640 A.2d at 955-956, the Rhode Island Supreme Court refused to impose a duty of care upon the defendant, the former owner of land sold to the plaintiff. Specifically, the Rhode Island Supreme Court did not require the defendant to inform the plaintiff of chemicals on the land, used in the defendant's operations, which the plaintiff had to remediate subsequent its purchase. In support of its holding, the Rhode Island Supreme Court emphasized that the relationship between the seller and purchaser in a commercial transaction is governed by the doctrine of caveat emptor, which it noted, has "long dominated real estate transactions in Rhode Island" Id.
at 956. In Hydro, the Rhode Island Supreme Court also commented that "[b]uyers of contaminated land, unlike the victims of negligent acts, are in a position to protect themselves though contract or by refusing to conclude a transaction." Id.
Recognizing said doctrine's applicability in a commercial setting, the Fulford Defendants argue they had no duty to inform the Plaintiff that the Property possessed USTs. The Fulford Defendants further assert the Plaintiff could have negotiated an indemnity clause in the Sales Agreement with them to protect itself against future liabilities. As the Plaintiff did not shield itself from liability through contract, the Fulford Defendants argue the Plaintiff remains liable for the USTs on the Property.
The Fulford Defendants further rely upon Boston Investment,
658 A.2d at 517-518. There, the purchaser of the then-newly built commercial office building sued the former owner of the property, as well as the developer and general contractor, for certain defects. The plaintiff purchased the property with no express warranties as to its condition and was attempting to hold the general contractor liable on a negligence theory. The Rhode Island Supreme Court held that the plaintiff was limited to contractual remedies to recover its purely economic losses. Id.
at 517. The Rhode Island Supreme Court noted that the purchaser was a commercial entity who could have inspected the property and inquired into defects. Moreover, the Rhode Island Supreme Court held that as between sophisticated commercial entities in the commercial real estate market, contract, not tort, law "is the proper device to allocate economic risk." Id. Therefore, the Fulford Defendants argue the Plaintiff is limited to the terms of its Sales Agreement which contained no indemnity or warranty from the Fulford Defendants.
In addition, the Fulford Defendants cite a United States District Court for the District of Rhode Island case to demonstrate the inadequacy of the Plaintiff's due diligence of the Property. See Wilson Auto Enterprises, Inc. v. Mobil OilCorp., 778 F. Supp. 101, 104-105 (D.R.I. 1991). There, the federal court stated that it is the purchaser of commercial property who "bears the risk of defects existing in the land at the time of the transfer and he is expected to make his own inspections." Id. at 104. The Fulford Defendants note that the federal court was particularly condemnatory of the purchaser's failure to make even basic inquiries as to the property given the purchaser's knowledge of how the property had been used prior to purchase and, thus, the "obvious possibility that the property might be soaked with pollutants." Id. at 105. The Fulford Defendants argue the Plaintiff's actions in this case are also worthy of condemnation. The history of the Property — the manufacturing business, the tornado, the demolition — should have prompted the Plaintiff to make a reasonable inquiry into the existence of pollutants. The Fulford Defendants argue the Plaintiff, to its own detriment, did not conduct a serious due diligence of the Property.
Finally, the Fulford Defendants argue that the one exception to the rule of caveat emptor which applies to a commercial real estate transaction in Rhode Island does not apply here. To the Fulford Defendants, the fraudulent misrepresentation exception does not apply because, according to the Fulford Defendants, the Plaintiff claims only that HMS and Hart knew of the USTs and did not disclose that knowledge to Plaintiff at the time of sale. The Plaintiff presented no proof of an inquiry or reliance upon a misrepresentation about the Property made by the Fulford Defendants.
The Plaintiff's Argument
The Plaintiff argues that the exceptions to the doctrine of caveat emptor recognized in Rhode Island do not differentiate between commercial and residential property as the Fulford Defendants proffer. The Plaintiff relies upon Chapter 20.8 of Title 5, which deals with required disclosures in real estate transactions, to demonstrate that the Fulford Defendants' differentiation of commercial versus residential transactions is not followed in Rhode Island law and that an exception to the doctrine of caveat emptor applies, if it exists, regardless of the type of property at issue. Specifically, the Plaintiff refers to G.L. § 5-20.8-1(6) and G.L. § 5-20.8-2(2), which although enacted in 1992, and not applicable in this case, reveal that real estate includes vacant land and that USTs on vacant land require disclosure. Said provisions state:
 "G.L. § 5-20.8-1 Definitions. —
 (6) "Real Estate" means vacant land or real property and improvements consisting of a house or building containing one to four (4) dwelling units.
 G.L. § 5-20.8-2 Disclosure requirements (b)(2) The disclosure form shall include the following information:
 . . . .
 (xiv) Heating Sytem — (Type, Imp. Repairs, Undergound Tanks, Zones, Supplemental Heating, Defects)
 . . . .
 (xxxiii) Hazardous Waste — (Asbestos and Other Contaminants)."
Notwithstanding this legislation, the Plaintiff argues an exception to the rule of caveat emptor — passive concealment of a material defect — applies to this case. See Stebbins v.Wells, 766 A.2d 369 (R.I. 2001). This exception "`places upon the seller or agent a duty to disclose in situations where he or she has special knowledge not apparent to the buyer and is aware that the buyer is acting under a misapprehension as to facts which would be important to the buyer and would probably affect its decision.'" Id. at 373 (quoting Hoffman v. Fletcher,244 Ga. App. 506, 535 S.E.2d 849, 851 (Ga. Ct. App. 2000). The Plaintiff finds there is no support in the case law that this requirement applies only to residential property transactions, and that it is self-serving for the Defendants to argue that the exception applies just to residential transactions just because the cases cited involve residential property.
The Plaintiff contends that at, and prior to, the time of sale of the Property to the Plaintiff, Hart, as principal of Fulford, knew of the existence of the USTs containing fuel oil on the Property. The Plaintiff further contends that Hart knew that the presence of the USTs, containing fuel oil, was a material defect which would be of concern to any prospective buyer of the Property, including the Plaintiff. The Plaintiff also claims Hart, in connection with the sale of the Property, after actively concealing the material defect in having IBWC remove or cover over all surface physical evidence of the presence of the USTs, passively concealed the material defect in failing to disclose the material defect to the Plaintiff. In the Plaintiff's view, Hart's concealment of this material defect constitutes a fraud upon the Plaintiff by which the Plaintiff has been damaged. The Plaintiff distinguishes the case of Hydro from the present case because the plaintiff in that case was a remote purchaser of land The Plaintiff argues that if the plaintiff in Hydro were the direct purchaser of the commercial property from the defendant, as in the case at hand, the caveat emptor exception would have applied.
Additionally, the Plaintiff maintains it had no good reason to go digging exploratory holes on the Property. The Plaintiff contends it was simply buying vacant land for use as a parking lot and relying upon the seller's good faith. The Plaintiff finds it ironic that the Fulford Defendants fault the Plaintiff for not discovering the USTs they concealed when Hart himself, the principal of HMS and Fulford, claims no knowledge of their existence. Furthermore, the Plaintiff asserts the Fulford Defendants failed to explain why DiBattista's knowledge would put him on notice that the Fulford plant was serviced by USTs or that they were left in the ground. The Plaintiff contends the Fulford Defendants fail to point out that, after the tornado, city officials and the RIDEM were all over the property, and subsequent to the demolition, the RIDEM had issued an unrecorded notice of violation against the Property for hazardous wastes remaining on the premises. Plaintiff also notes that Hart complied with these RIDEM directives and that the RIDEM signed off on the property.
The Plaintiff also asserts that it conducted due diligence with regard to the Property. The Plaintiff states it did a search of the land evidence records, made in connection with the Plaintiff's purchase, which revealed no recorded environmental liens or notices of violation, and noted that a policy of title insurance was issued on the Property. The Plaintiff points out that its purchase of the Property was fully financed, but that the lender required no environmental testing. The Plaintiff also claims that DiBattista walked the Property on several occasions and noted no evidence of any covers, filler ports or vents to USTs which might put him on notice of USTs. Though it made no inquiry of the RIDEM as to the status of the Property, the Plaintiff contends that, even if it had, it would have learned only the following: that RIDEM had inspected the Property and had issued an unrecorded notice of violation, that the RIDEM's directives were complied with, and that RIDEM had no present interest in the Property at that time. Despite this, the Plaintiff admits that if the rule of caveat emptor applies, its due diligence is irrelevant.
Analysis
The main issue to determining if there was a fraudulent nondisclosure here is whether a particular exception to the doctrine of caveat emptor exists for commercial real estate transactions in Rhode Island More specifically, the issue is whether the exception of passive concealment of a material defect, which already applies to residential real estate transactions in Rhode Island, applies to Rhode Island commercial real estate transactions. This Court finds no such exception exists under Rhode Island law. Neither the Rhode Island courts nor legislature have made such an exception, and given the long historical use and reliance upon caveat emptor in commercial real estate transactions in Rhode Island, this Court finds strong policy considerations oppose the judiciary's carving out such a new exception.
The Plaintiff's reliance on the Rhode Island Supreme Court's reference to the case of Hydro-Manufacturing, Inc. v.Kayser-Roth Corporation, 640 A.2d 950, 956 (R.I. 1994), is misplaced. Foremost, the reference by the Rhode Island Supreme Court to such an exception was merely in an informational footnote wherein the Court pointed out its awareness of such a law in other jurisdictions. The footnote provided:
 "Certain exceptions to the doctrine of caveat emptor have developed based on equitable principles. See e.g., Graham v. United States, 441 F. Supp. 741, 743 (N.D. Tex. 1977) (duty to disclose dangerous conditions known to vendor); Padula v. J.J. Deb-Cin Homes, Inc., 111 R.I. 29, 32, 298 A.2d 529, 531 (1973) (`where a builder-vendor sells a house * * * he implicitly warrants * * * the dwelling will be reasonably fit for human habitation')." 640 A.2d at 956 n. 3.
The informative nature of this note is strengthened when placed in the context of both the decision and the sentence footnoted. Both support the doctrine of caveat emptor. The sentence provides: "[u]nder the doctrine of caveat emptor, which has long dominated real estate transactions in Rhode Island, n3 id., the liability of the seller can thus be limited by the terms expressed in the agreement between the parties." Id. Moreover, in that case, the Rhode Island Supreme Court found the defendant did not owe a duty to plaintiff, and the parties' relationship was controlled by the doctrine of caveat emptor. Id. at 955-56. Since the doctrine of caveat emptor applies, the Fulford Defendants did not owe the Plaintiff a duty to disclose the presence of USTs on the Property at the time of the sale; therefore, this Court grants the Fulford Defendants' Motion for Summary Judgment as to the Plaintiff's claim for fraudulent nondisclosure.
This Court further notes the inadequacy of the Plaintiff's due diligence prior to purchasing the Property. Environmental due diligence is a vital step for a prudent real estate purchaser. It is necessary to "assess environmental risks in some fashion or else risk being blind-sided by catastrophic losses." Jeffrey C. Fort, Roger W. Patrick, Maribeth Flowers, Due Diligence forEnvironmental Issues in Transactions, in Attorney's Guide toEnvironmental Liability in Transactions, Illinois Institute for Continuing Legal Education 1-1 to 1-56, at 1-4 (1991) (hereinafter Attorney's Guide). Environmental due diligence in real estate deals focuses on "any existing and potential environmental liabilities that may arise from ownership or use of real property." Id. at 1-5. The Attorney's Guide notes that the cornerstone of environmental due diligence is usually an environmental audit (sometimes referred to as an environmental assessment or risk report), which is "performed by outside consultants working under the supervision of environmental lawyers." Id. Such audits are typically divided into three phases: "Phase I includes qualitatively identifying past and present sources of environmental contamination; Phase II includes developing a scope of work for the consultants and implementing sampling if required; and Phase III includes removing contamination." Id. at 1-6 to 1-8. The Plaintiff did not conduct such an audit.
At a minimum, the Attorney's Guide suggests an environmental audit for real property usually should address seven questions, one of which is the following: "[h]as the property ever contained any underground or above-ground storage tanks? Have these tanks ever leaked? If tanks are currently present, is the owner in compliance with regulations — including any obligation to investigate and remediate leaks?" Id. at 1-8, Question 4 (emphasis added). The failure of the Plaintiff to ask such a question speaks volumes about the representation provided to the Plaintiff at the time of sale, particularly since the Plaintiff's representatives allegedly knew that demolition work was performed at the site.[7] The time frame of the sale is also noteworthy. The entire sales transaction of the Property at issue took place in a matter of months, whereas the Attorney's Guide suggests that a "bare bones assessment of a piece of property that has been farmland since the time of the Pilgrims may take as long as three to four weeks to complete." Id. 1-24 to 1-25.
Without directly raising it, the Plaintiff's claim alludes to the often overlooked fairness issues at play in the application of the doctrine of caveat emptor in commercial real estate sales. Fairness issues are particularly compelling in this case because, even if all of the Defendants were aware of the USTs and knew that their contents were dangerous, they could allow the Property to be sold without disclosing this knowledge without future liability for the USTs. This Court finds these implications of the caveat emptor doctrine worthy of discussion.
At least one court has conveyed concern over the apparent inequity of the doctrine of "buyer beware." In Haskell Co. v.Lane Co., a Florida appellate court reluctantly affirmed the application of caveat emptor to a commercial real property sale while simultaneously expressing disfavor with the doctrine's continued use because it is goes against "current notions of justice, equity and fair dealing." 612 So.2d 669, 676 (Fla. Dist. Ct. App. 1993) (quoting Johnson v. Davis, 480 So.2d 625, 628 (Fla. 1985)). The court asked the Florida Supreme Court to determine whether "the common law doctrine of caveat emptor [should] continue to apply to commercial real property transactions; and, if not, with what legal principles should it be replaced?" Id. (emphasis omitted.) Despite the appellate court's plea, the Florida Supreme Court left this question unanswered and dismissed the appeal without opinion. This case and the question of whether disclosure responsibilities in commercial real property sales should be imposed on seller is well addressed in a note in the Southern California Law Review.See Kathleen McNamara Tomcho, Note: Commercial Real EstateBuyer Beware: Sellers May Have the Right to Remain Silent, 70 So. CAL. L. REV. 1571 (1997).
This Court upholds the application of the doctrine of caveat emptor to commercial real estate sales in Rhode Island and leaves to the appropriate government agencies the debate as to whether or not there should be a change in the doctrine of caveat emptor.
 COMMON LAW NEGLIGENCE CLAIM
The Plaintiff claims that IBWC acted negligently toward the Plaintiff, a prospective buyer of the Property. Scottsdale argues the Plaintiff has not met the elements of a negligence claim as IBWC owed no duty to the Plaintiff. In contrast, the Plaintiff argues a duty existed because the Plaintiff was foreseeable.
Scottsdale's Argument
Scottsdale argues there is no legal basis for the Plaintiff to recover against IBWC under a negligence theory, even assuming the Plaintiff's allegations are true. Scottsdale asserts that Rhode Island recognizes black-letter tort law, requiring the existence of a duty in order to find liability. Hydro, 640 A.2d 950, 955 (R.I. 1994). Scottsdale contends IBWC owed no duty to the Plaintiff, and therefore, is not liable to the Plaintiff under a negligence theory. Scottsdale maintains IBWC did not owe the Plaintiff a contractual duty as it is undisputed that there is no contractual relationship between IBWC and the Plaintiff, and that the Plaintiff acquired the Property well after IBWC completed its demolition work. Scottsdale further argues, because Rhode Island courts embrace a traditional common law caveat emptor approach to real estate sales, no cognizable legal duty to disclose or clean up defects, such as environmental contamination on real estate, is owed to a buyer by the seller.[8] Since IBWC was a sub-contractor and not in privity with the Plaintiff, Scottsdale argues there is even less reason to hold that it had a legal duty to disclose or clean up the environmental defects at the site.
Scottsdale notes that where privity of contract is absent between a contractor and a subsequent purchaser of commercial property, there is no duty on the part of the contractor towards that purchaser. Hence, in Scottsdale's view, the Plaintiff cannot recover economic damages that were allegedly caused by the negligence of IBWC. See, e.g., Boston Investment Property #1State v. E.W. Burman, Inc., 658 A.2d 515, 517 (R.I. 1995). As a future buyer, Scottsdale argues that the Plaintiff was unidentifiable to IBWC and that there was no foreseeable harm to it, particularly since the Fulford Defendants could have corrected any problems or absorbed any losses before any sale.Id. at 517. Moreover, HMS, as the original owner of the Property, could have identified what the Plaintiff's claims were in descriptions of the Property (i.e. the presence of USTs).
Scottsdale distinguishes Forte Bros. v. National Amusements,Inc., 525 A.2d 1301 (R.I. 1987) (allowing a plaintiff to maintain a tort claim of negligence for purely economic loss in the absence of privity), from the present case. Setting forth the same reasons as set forth by the Rhode Island Supreme Court in another case distinguished from Forte, Scottsdale finds Forte
distinguishable from this case because in Forte "the plaintiff contractor and the defendant architect were collaborators on the same project, with each dependent on the other to complete the project," and "[t]hey were aware of each other's presence, and each had an interrelated contract with the property owner."Boston Investment, 658 A.2d 515, 516-517 (R.I. 1995). Since "Forte's payments for the excavation were directly dependent on Allen's supervision and certification, the foreseeability of harm to Forte was high if Allen failed to perform its job." Id.
Here, Scottsdale argues there was no "collaboration" between IBWC and the Plaintiff since they were unknown to each other and had no "interrelated contract" with the property owner. Therefore, Scottsdale argues the Plaintiff was not foreseeable.
Scottsdale contends that even if IBWC owed a legal duty to Plaintiff (which Scottsdale denies), there would be no basis for recovery against IBWC under a negligence theory since the Plaintiff provided no factual support establishing that IBWC's conduct was the proximate cause of injury to the Plaintiff. To Scottsdale, IBWC's demolition activities did not involve the disposal of any hazardous waste and did not involve any work related to USTs.
The Plaintiff's Argument
The Plaintiff argues that IBWC can owe a duty to the Plaintiff, despite the lack of a contract between them, "when the plaintiff shows that the defendant breached a duty of care owed to the plaintiff and that this breach proximately caused an injury to the plaintiff resulting in actual damages. There is no requirement of privity in Rhode Island to maintain an action in tort." Forte Bros. v. Nat'l Amusements, Inc., 525 A.2d 1301, 1303 (R.I. 1987). The Plaintiff maintains Scottsdale ignores the importance of foreseeability as an important ingredient in determining whether a duty exists. See Boston Investment,658 A.2d 515 (R.I. 1995). The Plaintiff contends the Plaintiff's liability for the environmental defect in the Property, caused by IBWC's violation of the law, was foreseeable.
The Plaintiff claims IBWC through its acts and omissions, which secreted the existence of the USTs, behaved in negligent or reckless disregard of the known liability to inure to any prospective purchaser of the Property, including the Plaintiff, to remove the USTs. As a proximate result of the aforementioned negligent or reckless acts and omissions of IBWC, the Plaintiff was damaged as aforesaid and prays that judgment enter against IBWC, and that the Plaintiff be awarded its compensatory damages, interest, and costs.
The Plaintiff refers to various testimony and evidence to prove IBWC's knowledge of the USTs. The Plaintiff offers Scottsdale's investigative report on IBWC, which recites that IBWC's business activities include the removal of USTs. The Plaintiff notes that Karen Ney of IBWC, acting for Hart, filed the application for the demolition permit, including in the margin the "digsafe" number and the notation "TANKS." The Plaintiff points out another notation, "underground included," on the demolition coverage page of the Scottsdale policy made by Warburton Insurance, Inc., (Warburton) IBWC's agent, and argues this reflects an inquiry made by Warburton of Scottsdale, or its agent, on behalf of IBWC as to whether the coverage included underground hazard coverage. The Plaintiff notes James Ney of IBWC's contradictory testimony that he did not know of the USTs, yet identified them in a sketch, which he identified as "his work," of the property made prior to the demolition that depicts the USTs.
The Plaintiff also refers to evidence showing that prior to the demolition the existence of the USTs was readily discernible by the covers of their filler ports, which were visible in the courtyard outside the Fulford building's boiler room. The Plaintiff notes that Antignano, IBWC's principal, testified that at the request of Hart, he lifted the roof off the Fulford building's boiler room to crane out and place, and that Hart had represented the oil-fired boiler as being sold. The Plaintiff also notes that Antignano admitted he was aware of the USTs because common sense dictates that fuel tanks must supply boilers, and that he was aware of the process of fuel tank closure.
The Plaintiff further contends the covers to the filler ports of the USTs were visible in the courtyard following the tornado and prior to the demolition, but were not visible after the demolition. The Plaintiff argues IBWC's work extended outside the footprint of the Fulford building, contrary to what Scottsdale alleges. To that end, the Plaintiff asserts that James Ney, on whose testimony Scottsdale relies upon for its conclusion that IBWC's work was limited to the footprint, testified that he took no part in the demolition. More significantly, the Plaintiff points out that Scottsdale ignores Antignano's testimony that he cut the property without the footprint of the building as much as eighteen inches to slope it to grade.
In addition, the Plaintiff notes that none of the three USTs removed from the Property by Lincoln had filler ports or vent ports to surface remaining. The Plaintiff references Hart's testimony that he hired IBWC to demolish the building and leave a clean site ready for sale. The Plaintiff observes there is no evidence that anyone, other than IBWC, did any excavation on the Property between the time the City ordered the building to be demolished and Lincoln's testing in 1995 and 1996. The Plaintiff argues this evidence leads to only one conclusion: that IBWC, in the course of its work upon the Property, removed the covers and fill and vent ports to the tanks and covered over all surface evidence of the existence of the USTs and fuel remaining beneath the Property.
Analysis
The central issue here is whether the Plaintiff has sufficiently alleged that a genuine issue of material fact exists as to whether IBWC was negligent. "Negligence is the breach of a duty, the existence of which duty is a question of law." Barrattv. Burlingham, 492 A.2d 1219, 1222 (R.I. 1985). "If no such duty exists, then the trier of fact has nothing to consider and a motion for summary judgment must be granted." Id. "[T]he trial justice should determine whether the law imposes a legal duty upon the defendant in the particular factual circumstances presented in any given case." Kuzniar v. Keach, 709 A.2d at 1055. To determine whether a duty exists, the Rhode Island Supreme Court stated in Banks v. Bowen's Landing Corp.,522 A.2d 1222, 1224-25 (R.I. 1987), that:
 "[n]o clear-cut rule exists to determine whether a duty is in fact present in a particular case; however, courts such as the California Supreme Court have articulated several factors that may be applied to aid in that determination. In considering whether a duty exists, among the factors considered are (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach."
Here this Court does not find any of the above five factors present. Even if IBWC were aware of the USTs and removed the covers and fill and vent ports to the tanks and covered over all the surface of the existence of the USTs as the Plaintiff claims, IBWC owed no duty to the Plaintiff with regard to the USTs. The facts reveal that IBWC did not actually know the Plaintiff and could not foresee any harm to the Plaintiff.
The record indicates that IBWC had no contractual duty to the Plaintiff since IBWC contracted solely with the Fulford Defendants. In return for the payment of $50,000, IBWC agreed to "remove the building to approximately grade and break the foundation walls approximately one foot below grade." There was a written contract for the demolition work performed by IBWC, which Hart signed on behalf of Fulford. While IBWC's records for the project no longer exist, and no one involved in the case has been able to locate the contract, the facts indicate that Hart contracted with IBWC to perform demolition work only and IBWC had no responsibility whatsoever with regard to the USTs. Moreover, all of the demolition contracts which IBWC entered into included a provision stating that IBWC would not remove any hazardous waste. The USTs were present at the site prior to the demolition and remained their afterwards. The Plaintiff purchased the site well after the demolition work had been completed. Consequently, IBWC had no relationship with the Plaintiff whatsoever as IBWC was not privy to the conditions of the sale of the Property and did not know what the Property would be used for after the sale. The facts provided by the Plaintiff also do not indicate that even if IBWC were aware of the existence of the USTs, IBWC knew the USTs would be in violation of RIDEM regulations when the Property was sold. Thus, IBWC could not know with any certainty whether the status of the USTs would harm a prospective buyer. Prior to the sale, the USTs were property of the Fulford Defendants and in their full control and responsibility.
The Plaintiff does not provide sufficient evidence of negligence such that a genuine issue of negligence exists for trial. Accordingly, this Court grants Scottsdale's Motion for Summary Judgment on the claim of negligence on the ground that the duty element was not established.
 CONCLUSION
This Court grants the Fulford Defendant's Motion for Summary Judgment and Scottsdale's Motion for Summary Judgment. The Plaintiff's case is therefore dismissed as no issues remain for trial.
[1] HMS Associates Limited Partnership (HMS) changed its corporate form in 1997 to become X Y Associates, LLC. Subsequently, X Y Associates, LLC changed its name to become HMS Associates, LLC. The action against HMS (C.A. No. 96-6273) was filed in 1996, prior to these changes.
[2] Hotel Associates Realty Trust changed its corporate form in 1994 and became the current Hotel Associates, LLC, the Plaintiff.
[3] This is the figure provided in the Plaintiff's Amended Complaint. See Plaintiff's Amended Complaint, ¶ 14. This figure differs from the amount provided in Plaintiff's Memorandum in Opposition to the Fulford Defendants' Motion for Summary Judgment, which estimated the expenses as $164,000.00. See
Plaintiff's Memorandum in Opposition to HMS, Hart, and Fulford's Motion for Summary Judgment at 1.
[4] Finding there is no merit to these claims raised by the Plaintiff against Scottsdale, this Court declines to rule on the insurance coverage issues raised by Scottsdale in its Memorandum of Law in Support of its Motion for Summary Judgment — whether there was an "occurrence" during the Scottsdale Policy period, whether the Plaintiff sustained property damage during the Policy period, whether the Plaintiff's claims were barred by the Policy exclusions, and whether the Plaintiff's claims were untimely. In addition to successfully arguing there is no legitimate basis for the Plaintiff's claims, Scottsdale, as the insurer of the now defunct IBWC from April 15, 1986 to April 15, 1987, maintains there is no insurance coverage for the claims under the Policy at issue.
[5] Although citation to this order, which has no precedential effect, was improper, see Rule 16(h) of the Rhode Island Supreme Court Rules of Appellate Procedure, this order is illustrative since it was the first and only time this issue was addressed by the Rhode Island Supreme Court:
 "(h) [Unpublished orders.] Unpublished orders will not be cited by the Court in its opinions and such orders will not be cited by counsel in their briefs. Unpublished orders shall have no precedential effect." (Emphasis in original).
[6] The Plaintiff did not provide section 3.01 to this Court as its supporting law from the 1992 Amendments. Moreover, the "Table of Contents" to the 1992 Amendments, provided by the Plaintiff with its supporting law, reveals that section 3.00 of the 1992 Amendments regards "Superseded Rules and Regulations," not
applicability, which is located under section 5.00. This Court determines, therefore, that section 3.01, is not embodied in the 1992 Amendments. This Court notes that the only difference between this section 3.01 on Applicability and the section on Applicability aforementioned by the Plaintiff under section 5.00 in the 1992 Amendments is a change from the word "since" to "after" and the section number. Furthermore, since the Plaintiff does not specify the source of this regulation, cited only in its Surreply with respect to the Fulford Defendants' arguments, this Court must assume that the Plaintiff's citation to section 3.01 of the UST Regulations refers to section 3.01 of the 2002 UST Regulations. This Court makes this assumption because the section cited by the Plaintiff is identical to that embodied in the 2002 UST Regulations. The 2002 UST Regulations became effective on October 22, 2002.
[7] The Attorney's Guide is located in the Rhode Island public law library in Providence County.
[8] Scottsdale adopts and incorporates by reference the factual statements and arguments advanced by the Fulford Defendants and the case law cited in support of their Motion for Summary Judgment with regard to the issue of whether there was a duty to disclose environmental hazards at the Property to the Plaintiff.See Scottsdale's Memorandum of Law in Support of its Motion for Summary Judgment, C.A. No. 97-0507 at 19 n. 9 (filed July 22, 2003).